**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 1 0 2020

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

SHAYLA HOOKS, an Arkansas citizen, and
TYRONE JACKSON, an Arkansas citizen,

     Plaintiffs,

v.

LANDRY'S, INC., a Delaware corporation,
d/b/a SALTGRASS STEAKHOUSE,

     Defendant.

Case No. *4:20CV1078-KGB*

***JURY TRIAL DEMANDED***

This case assigned to District Judge _Baker_
and to Magistrate Judge _Kay_

## COMPLAINT

NOW COME Plaintiffs, SHAYLA HOOKS, an Arkansas citizen, and TYRONE JACKSON, an Arkansas citizen, by and through their attorneys, LAUX LAW GROUP, and for their cause of action against Defendant, LANDRY'S, INC., a Delaware corporation, d/b/a SALTGRASS STEAKHOUSE, (hereafter "LANDRY'S, INC.") state as follows:

### INTRODUCTION

As of the filing of the instant complaint, COVID-19 continues to pervade the State of Arkansas, despite the government's best efforts to contain the deadly virus. COVID-19 protocols and requirements have been in place since April 2020. It is an unfortunate fact, however, that implementing these precautions—even the mere public safety act of wearing a face mask—can draw the anger, aggression and even violence of a certain segment of society. This is a fact surely known by LANDRY'S, INC. on June 27, 2020, based on newspaper articles, cable news stories and service industry accounts alone.

Despite this knowledge, when LANDRY'S, INC., a self-appointed industry leader, needed to exercise responsible stewardship during global pandemic, LANDRY'S, INC. utter failed. Not

only did LANDRY'S, INC. fail to do the right thing but, in shirking its responsibility to protect its paying guests, LANDRY'S, INC. actually increased the likelihood of danger faced by those same guests, a most unfortunate set of facts described *infra*.

LANDRY'S, INC.'s charge was important and well-defined. It simply required following the rules as laid out by the State of Arkansas. One of the primary reasons we have rules in a civilized society is to keep people safe. *See Image No. 1 below.* This is a basic lesson we, as a society, pass on to children, as evidenced by an article found on the homepage of *Bring Your Own Science*, a non-profit scholastic organization that helps middle- and high-school kids compete in national science fairs projects:

**Keep the People Safe**

Often times, the simplest of rules help protect us from ourselves. Like not driving through an intersection when the light is red or not touching an electrified fence.

If you just look at all the traffic regulations we have, you'll see why they are set in place. Just imagine how many devastating accidents will happen if everyone just decided to disregard the rules.

Also, the rules are there to protect us from one another, or more specifically, from our basic self-serving instincts and self-destructive habits. If we don't have the rule of law that punishes criminal acts like murder and stealing, then you can trust that crime rate will skyrocket. Even the most basic rule like proper garbage disposal needs to be followed. Otherwise, the very planet will be at risk and will the entire humankind.

Image No. 1: Excerpt from *"What are Rules and Why Do We Need to Follow Them."*—*Bring Your Own Science* © 2020.

In the instant case, LANDRY'S, INC.'s failure to meet its most basic responsibilities during a global pandemic—keeping its customers safe and protecting them from harm—and its unconscionable passing of the buck for enforcing COVID-19 protocol to PLAINTIFFS resulted in serious physical injuries and emotional distress to PLAINTIFFS and, in today's unfortunate social climate, it surely could have gotten them killed. LANDRY'S, INC.'s conduct on June 27, 2020 was egregious and punitive damages are warranted on the facts presented by PLAINTIFFS.

2

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over this case because complete diversity of citizenship exists between Plaintiffs, SHAYLA HOOKS and TYRONE JACKSON (hereafter collectively "PLAINTIFFS"), each of whom are citizens of Arkansas, and Defendant, LANDRY'S, INC. which is incorporated in Delaware and has a principal place of business in Texas and because PLAINTIFFS seek damages in excess of $75,000 exclusive of interest and costs. See 28 U.S.C. §§ 1332, 1441(b).

2.      Venue is proper in the Eastern District of Arkansas Federal District Court because the acts and omissions of which PLAINTIFFS complain occurred in Pulaski County, which is located in the Eastern District of Arkansas.

## PARTIES

3.      Plaintiffs, SHAYLA HOOKS and TYRONE JACKSON (hereafter collectively "PLAINTIFFS"), are, and at all relevant times were, residents of Little Rock and citizens of the State of Arkansas.

4.      Defendant, LANDRY'S, INC., is a Delaware corporation with its principal place of business in the City of Houston, Harris County, Texas.  Accordingly, LANDRY'S, INC. is a citizen of Texas.

5.      At all relevant times, LANDRY'S, INC. owned and operated more than 600 restaurants, hotels, casinos and entertainment destinations in 35 states and the District of Columbia.  At all relevant times, including June 27, 2020, LANDRY'S, INC. owned and operated a restaurant located on the west side of the City of Little Rock, Saltgrass Steakhouse.

3

## BACKGROUND AND FACTUAL ALLEGATIONS

6.      The COVID-19 virus is a serious respiratory illness caused by a novel coronavirus. COVID-19 was first discovered in Asia in December 2019, and quickly spread throughout the world resulting in a global pandemic.  The first COVID-19 case in Arkansas was reported on March 11, 2020, prompting Governor Asa Hutchinson to issue Executive Order 20-03, which declared a state of emergency in Arkansas and suspended businesses that require significant person-to-person interaction, *inter alia.*

7.      The COVID-19 virus primarily spreads via respiratory droplets produced when an infected person sneezes or coughs.  These droplets can travel up to six (6) feet.  By mid-March 2020, restaurants operating in the State of Arkansas knew that the spread of COVID-19 occurs when people are in close contact, meaning less than six (6) feet.

8.      On April 4, 2020, Gov. Hutchinson issued an official Proclamation (*i.e.*, Executive Order) concerning COVID-19 for the purpose of imposing restrictions to prevent the spread of the virus.  See Hon. Asa Hutchinson April 4, 2020 COVID-19 Proclamation, attached hereto as Exhibit 1.  The Proclamation read in pertinent part:

> WHEREAS: All Arkansas citizens *must observe* proper social distancing, and the Department of Health has issued a directive on proper social distancing, protocols for businesses, manufacturers, construction companies, and places of worship… (emphasis added)

9.      A proclamation of the governor, when duly promulgated and filed, occupies a position comparable to laws regularly passed by the legislature.  Executive orders have the force and effect of law and are effective beyond the expiration of the term of the governor who issued them.

10.     Gov. Hutchinson affixed the Great Seal of the State of Arkansas to his official April

4, 2020 Proclamation to signify the codification, incorporation and/or adoption of the COVID-19

protocol and requirements contained within the document. *See Image No. 1 below.*



**Image No. 1: Great Seal of the State of Arkansas affixed to Gov. Hutchinson's April 4, 2020 Proclamation.**

11.     Still, despite these measures, by the end of April 2020, approximately 2600

COVID-19 tests were performed in Arkansas, with a 1.5% positivity rate.  At that time, this

represented the highest number of tests run in one day in the state since March 11, 2020.

<u>**Arkansas Phase 1 COVID-19 Protocols and Requirements**</u>

12.     On April 29, 2020, Gov. Hutchinson issued an official State of Arkansas press

release wherein he announced a May 11, 2020 reopening date for limited dine-in restaurant

services for Arkansas restaurants, like Saltgrass Steakhouse, stating:

> Based on current data that shows we have slowed the spread of
> COVID-19, *we have decided it safe to resume dine-in restaurant
> service with some common-sense limits*.  This is a significant but
> cautious step on the path back to normalcy.  We will monitor the
> success of this step, and move to Phase 2 as quickly as we safely
> can. (emphasis added)

13.     As of May 8, 2020, the Arkansas Department of Health (ADH) confirmed a total of 3,747 positive cases of COVID-19 in Arkansas.  By that date, there were nearly 700 active COVID-19 cases in Arkansas, with 88 reported deaths and 64 hospitalizations.

14.     On May 8, 2020, via executive order, Gov. Hutchinson announced the implementation of the ADH's directive on resuming restaurant dine-in operations (Phase 1), set to take effect on Monday, May 11, 2020.  Thus, on May 11, 2020, per the governor's order, Arkansas restaurants were allowed to resume dine-in service to business guests.  However, under Phase 1, in exchange for the privilege of reopening, Arkansas restaurants were required to modify their prior practices significantly in order to better assure public safety.

15.     Among the several pertinent requirements imposed upon Arkansas restaurants by the ADH via Phase 1 are:

- A mandatory limitation of up to 33% of total seating capacity for dine-in service;

- Mandatory physical distancing of seating adjusted to maintain 10-foot distance between tables so occupied seats are six (6) feet from seats at adjacent tables;

- Mandatory maintenance of physical distancing for non-reservation customers who are waiting to be seated;

- Mandatory staff usage of facemasks covering their noses and mouths for all staff who come into contact with restaurant guests;

- Mandatory restaurant guest usage of face coverings upon entrance into the restaurant and while in the restaurant until the food or drink is served;

- Mandatory signage at the front of restaurants to alert guests not to enter if they are sick or have symptoms such as cough, sore throat, fever or shortness of breath; and

- Mandatory limitation of ten (10) people for groups entering restaurant.

16.     The ADH press release stated that the Phase 1 restrictions would be in place until the Arkansas Secretary of Health determined epidemiological data were sufficient to proceed to Phase 2.

17.     The mandatory restrictions of Phase 1 were applicable to restaurants operating in the State of Arkansas—including Saltgrass Steakhouse—and required that any such restaurants adhere to the mandatory aspects of all executive orders and Gov. Hutchinson's COVID-19 protocols and requirements.

<u>**Arkansas Phase 2 COVID-19 Protocols and Requirements**</u>

18.     On June 10, 2020, Gov. Hutchinson announced the implementation of the ADH's second directive on resuming restaurant dine-in operations (Phase 2), which was set to take effect five days later, on June 15, 2020.  The Phase 2 revision retained many of the Phase 1 distancing and hygiene requirements.

19.     During his June 10 announcement, Gov. Hutchinson warned Arkansas citizens that they should remain vigilant of COVID-19 precautions, stating: "We're not out of the woods. We're still in the heart of the woods.  The emergency remains, and in fact, I am continuing the emergency order that does expire in mid-June.  I am continuing that for an additional 45 days."

20.     Per the express language of Phase 2, Arkansas restaurants were not permitted to increase their capacity from 33% (allowed during Phase 1) to 66% unless physical distancing requirements were maintained within the establishment.

21.     Among the several pertinent requirements imposed upon Arkansas restaurants by the ADH via Phase 2 are:

- Mandatory limitation of up to 66% of total seating capacity for dine-in service (increased from 33% during Phase 1, provided physical distancing requirements are maintained);

7

- Mandatory physical adjustment of restaurant seating to maintain a minimum of six (6) feet between occupied seats at adjacent tables;

- Mandatory usage of face coverings for restaurant guests while in the establishment when physical distancing of six (6) feet cannot be ensured (this is most likely in entry or waiting areas, while walking to their seat, visiting the restroom, etc.);

- Mandatory restaurant guest usage of face coverings upon entrance into the restaurant and while in the restaurant until the food or drink is served

- Mandatory maintenance of physical distancing for non-reservation customers who are waiting to be seated;

- Mandatory staff usage of facemasks covering their noses and mouths for all staff who come into contact with restaurant guests;

- Mandatory signage at the front of restaurants to alert guests not to enter if they are sick or have symptoms such as cough, sore throat, fever or shortness of breath; and

- Mandatory limitation of ten (10) people for groups entering restaurant.

22.     The June 10, 2020 ADH press release stated that bars housed within restaurants "are now allowed to operate, effective May 19, 2020, *so long as physical distancing of 6 feet between individuals is maintained*." (emphasis added)

23.     Put another way, if an Arkansas restaurant fails to maintain a physical distance of six (6) feet between its guests, then that Arkansas restaurant cannot legally operate the bar housed within it.

24.     The mandatory restrictions of Phase 2 were applicable to restaurants operating in the State of Arkansas—including Saltgrass Steakhouse—and required that any such restaurants, *inter alia*: 1) implement a mandatory 66% maximum seating capacity (provided physical

distancing requirements are maintained); 2) implement a mandatory physical seating adjustment that ensures a minimum six feet distance between seats; 3) implement mandatory face covering usage for guests when six feet distance cannot be ensured; 4) implement mandatory face covering usage for guests upon entrance into the restaurant and while in the restaurant until the food or drink is served; and 5) implement mandatory physical distancing for non-reservation customers who are waiting to be seated.

25.     After a steady upward climb over several weeks in March and April 2020, Arkansas' COVID-19 hospitalizations began to decrease in early-to-mid May.  However, between Memorial Day weekend and June 10, 2020, hospitalizations in the state again increased sharply, by approximately 82%.  *See Image No. 2 below.*



**Image No. 2: Arkansas COVID-19 hospitalizations March 2020 through early June 2020.**

26.     The COVID-19 pandemic was so formidable that, by June 2020, LANDRY'S, INC.—a self-described "Leader in Dining, Hospitality and Entertainment"— had its own COVID-19 guidelines which it held out to the public at large on its website.  At that time, found on LANDRY'S, INC.'s website homepage was an advisory captioned "Landry's is closely

monitoring developments around the spread of the novel coronavirus (COVID-19)."   In the

company advisory, LANDRY'S, INC. made the following public safety assurances:

> We are in the business of serving people and in the midst of this
> coronavirus outbreak, it's important that we give you as much
> information as possible about the procedures we follow to clean and
> operate our properties and maintain a sanitary environment.

*****

> **Social Distancing** – *Necessary steps will be taken to ensure that we*
> *are encouraging social distancing including spacing seated tables*
> *as required by each state.*  Signage will be posted in each location
> to further encourage these practices in the entry area as well as
> restrooms. (emphasis added)

*****

> Our management is in contact with the CDC and other federal
> agencies to understand the most up-to-the-minute information to
> ensure the actions we are taking are comprehensive and appropriate.

> We remain acutely vigilant about this serious crisis and will
> continue to do everything we can to protect our employees and our
> customers…*we will continue to practice and take part in preventing*
> *measures to ensure the safety of you and your family*.  (emphasis
> added)

*****

> Therefore, we ask that all guests comply with the following: **Keep**
> **6 feet between your group and others.**

### Tension, Agitation—Even Physical Fights—Over COVID-19 Protocols, Such As Face Coverings And Social Distancing, Are Reported Across The Nation

27.       Starting in early May 2020, there were well-publicized, nationwide news reports

chronicling instances of tension, agitation, physical fights and mob attacks, related to mandatory

COVID-19 protocols—such as face coverings and social distancing—in retail businesses, grocery

stores and restaurants.  In a May 5, 2020 *Washington Post* article entitled "*Coronavirus masks*

*become flashpoint for protests and fights as businesses, beaches and parks reopen*," the author described multiple instances of intimidation and violence inflicted upon those trying to follow COVID-19 rules.  Among the incidents described were:

- The physical battery of a gas station clerk in Decatur, Illinois after he insisted a customer wear a face mask in the premises;

- An assault against a Michigan Dollar Tree store employee by a customer who refused to cover his face while shopping;

- A man wearing a Ku Klux Klan hood to a California grocery store in an apparent protest of the store's mask requirement for shoppers; and

- The murder of a security guard in Michigan by a third party after the security guard argued with a woman who refused to comply with the statewide order requiring masks inside shops.

28.    The May 5 *Washington Post* article noted that "[a]lthough resistance to wearing masks appears to split along ideological lines in many instances, with protests against measures organized largely by conservative activists and championed by Republican lawmakers, polling has consistently indicated that most Americans support the social distancing precautions in place to prevent the spread of COVID-19 and many have been willing to wear masks."

29.    On May 12, 2020, cable network online arm, CNN.com, ran a news story entitled: "*Target employee breaks arm in fight with shoppers who wouldn't wear masks, police say*."  The piece reported on a May 1 incident in Los Angeles wherein customers attacked a retail store employee who was escorting them from the store for refusing to wear face coverings.  The incident occurred about two weeks after the mayor issued an emergency order requiring face coverings in grocery stores and other essential businesses.

30.     The opening sentence of a June 30, 2020 *New York Times* article–"*Fighting Over Masks in Public Is the New American Pastime*"—speaks to the dangerous ubiquity of tension, arguments and physical altercations over COVID-19 restrictions:

> On any given day, somewhere in the United States, someone is going to wake up, leave the house and get in a huge argument with a stranger about wearing masks.

31.     The June 30 *New York Times* article described one Texas man's account of a physical altercation in which he was involved:

> Joe Rogers, 47, a resident of Dallas, said that just last week, he had gotten in a physical fight over masks.
>
> In line at a Mini-Mart, he spotted a customer behind him not wearing a mask, he said, and he shook his head.  The man asked why Mr. Rogers had been looking at him and Mr. Rogers, again, shook his head.
>
> "I wear a full face guard, the mask that they use when they spray pesticides," he said.  "He reached for my mask and tried to pull it off." Mr. Rogers said his "natural instinct" came out and he put his hand up and knocked the man to the floor.

32.     The June 30 article described "vitriolic" encounters in a California restaurant, ones in which restaurant staff were "confronted with racist language" which raised serious concerns for their public safety.  One store manager featured in the *New York Times* article reported observing five confrontations over face coverings at work within a single hour.

33.     In the June 30 article, a South Florida "big box" store employee stated that fights over masks had become "astonishingly frequent" and that it was not uncommon for the police to be called to her store three to four times a day.  The *New York Times* article explained the potentially lethal consequences of these incidents: "The fighting between customers creates a tension that does not dissipate once the altercation has ended, [the employee] said.  She no longer

feels comfortable walking to her car alone after the store closes, concerned that an aggravated customer may be waiting for her there."

34.     It is a fact that by June 27, 2020, the physical danger associated with individuals who openly refuse to comply with COVID-19 protocols in public settings—specifically those which require face coverings and social distancing—was thoroughly reported by local and national media and was known within the retail and service industries.

<u>**PLAINTIFFS Visit Saltgrass Steakhouse On June 27, 2020, Fully Compliant
With State Of Arkansas Phase 2 Protocols And Requirements**</u>

35.     On June 27, 2020, at approximately 7:45 p.m., SHAYLA HOOKS (hereafter "SHAYLA") and TYRONE JACKSON (hereafter "TYRONE") decided to spend some of their hard-earned money supporting a local business, Saltgrass Steakhouse, where they had been regular patrons for some time.  In fact, TYRONE was a card-carrying member of "Landry's Select Club."

36.     Upon information and belief, Melissa Velasco (hereafter "Manager Velasco") was one of two (2) managers working at Saltgrass Steakhouse on the evening of June 27, 2020.  Also on staff that evening was Abigail Herrmann, who, upon information and belief, was a waitress at Saltgrass Steakhouse.

37.     Upon information and belief, at the time of PLAINTIFFS' arrival at Saltgrass Steakhouse on June 27, LANDRY'S, INC. was in violation of Arkansas' Phase 2 maximum capacity requirement insofar as capacity exceeded 66% of Saltgrass Steakhouse's normal maximum capacity of 296 persons.  Moreover, at that time, there were many individuals within the physical premises of Saltgrass Steakhouse who were not wearing face coverings.

38.     On June 27, 2020, while guests at the restaurant and at all relevant times, PLAINTIFFS wore face coverings and were fully compliant with the state's Phase 2 social distancing requirements for guests of restaurant businesses.

39.    Because Saltgrass Steakhouse was so crowded, PLAINTIFFS asked if they could sit in the bar area. Manager Velasco told them that certain areas were blocked off due to COVID-19 protocol and then directed them to an area the end of the bar which allowed social distancing for a customer already seated at the bar.

40.    At all relevant times, including the evening of July 27, 2020, there were at least three (3) operational video cameras inside the premises of Saltgrass Steakhouse: one (1) camera in the lobby of the restaurant; and two (2) cameras within the bar area where PLAINTIFFS were seated.

41.    Approximately 15 minutes after PLAINTIFFS' were seated in the bar area, a large tour bus pulled up in the restaurant parking lot and dozens of individuals from Louisiana—all white—began to disembark and enter Saltgrass Steakhouse. None of the individuals who exited the tour bus wore face coverings as they entered Saltgrass Steakhouse, a violation of COVID-19 protocol. Moreover, the large group did not abide by the social distancing requirements once inside the restaurant.

42.    A faction of the group, led by Robert Willis, a white male, approached Manager Velasco in search of group seating. Counting out several seats aloud while pointing to them, Mr. Willis told Manager Velasco that his group was going to sit in the immediate vicinity of PLAINTIFFS, even though to do so would be to further violate Arkansas' COVID-19 protocol for restaurants.

43.    Rather than follow Arkansas' COVID-19 protocol for restaurants an inform Ms. Willis that there was not sufficient seating in the area to safely accommodate his group, Manager Velasco placated the group at the expense of PLAINTIFFS' enjoyment and safety. Rather than

14

tell Mr. Willis something he did not want to hear, Manager Velasco replied within earshot of PLAINTIFFS, stating: "I don't care.  If it's OK with [PLAINTIFFS], then it's OK with me."

44.     With this abdication of her duties as a manager of a restaurant reopened during the COVID-19 pandemic, Manager Velasco shifted the responsibility for enforcement of Arkansas' COVID-19 protocol from management to guest.

45.     Mr. Willis' reckless approach to PLAINTIFFS as they dined—one expressly authorized, ratified and/or condoned by LANDRY'S, INC. through Manager Velasco—violated the Arkansas' COVID-19 rules in and of itself insofar as Mr. Willis' approach came within two (2) feet from PLAINTIFFS' persons, food and drink, a brazen act done with impunity in the presence of Manager Velasco.  Shortly after Mr. Willis' reckless approach toward PLAINTIFFS, Manager Velasco fled into the kitchen area or otherwise left the immediate scene.

46.     Mr. Willis asked PLAINTIFFS if they would permit his group of six (6) to sit in the immediate vicinity of PLAINTIFFS, which, if allowed, would be a violation of Arkansas COVID-19 requirements.  TYRONE politely responded in the negative, saying "Nah man, I don't think that is cool, what with COVID and all."

47.     Mr. Willis, who was clearly intoxicated, erupted at TYRONE's response, screaming "Are you fucking kidding me??  You're a dumb motherfucker."  Mr. Willis then stormed away from the area.

48.     Around that time, a second manager emerged from the back of the restaurant, and PLAINTIFFS informed him of what had just transpired and requested that the assailant—Mr. Willis—be removed from the premises.  Uninterested, the second manager refused to look into PLAINTIFFS' request.  The second manager said he did not see Mr. Willis do anything, despite

the fact that, without a face covering at the time, Mr. Willis' presence, alone, within Saltgrass Steakhouse was grounds to have him removed.

49.     Within a few moments, several white women in the group stood intentionally close to PLAINITFFS while ordering drinks at the bar.  While ordering their drinks and waiting for the drinks, the woman made comments of racial innuendo intended to be overheard.  They openly complained about "how fucking stupid people are about COVID."  No Saltgrass Steakhouse employee was anywhere to be found.

50.     Minutes later, a white man with the group approached PLAINTIFFS, got within inches of TYRONE's face and asked TYRONE if he had any problems with someone being so close.  Minutes after that, another white man with the group approached PLAINTIFFS and deliberately coughed at them, causing spit particles to land on SHAYLA.  No Saltgrass Steakhouse employee was anywhere to be found.

51.     When SHAYLA went to the restroom to wash up after the white man coughed on her, she was confronted by three (3) white women—none of whom wore face coverings—in the restroom.  They aggressively asked what SHAYLA's boyfriend's problem was, blocking the exit door, in an obvious attempt at intimidation.  SHAYLA was able to squeeze herself past them and got back to the bar.  No Saltgrass Steakhouse employee was anywhere to be found.

52.     Upon SHAYLA's return from the restroom, a restaurant patron took out his cell phone and began to record the escalating incident.  The cell phone video taken by the restaurant patron depicts a white woman aggressively pursuing and making unwanted physical contact with SHAYLA multiple times while a white man initiates unwanted physical contact with TYRONE. No Saltgrass Steakhouse employee was anywhere to be found.

16

53.    Eventually, PLAINTIFFS were physically attacked. *See Image Nos. 3-6 below.*



Image No. 3          Image No. 4          Image No. 5          Image No. 6

54.    PLAINTIFFS were viciously physically attacked but did their best to defend themselves despite being vastly outnumbered by the white mob from the tour bus. During the attack, Mr. Willis punched SHAYLA in the face, causing a black eye and other swelling. See *Image Nos. 7-10 below.*



Image No. 7          Image No. 8     Image No. 9          Image No. 10

55.    Following the attack suffered by PLAINTIFFS at Saltgrass Steakhouse, Ms. Herrmann, gave a voluntary statement to the police in which she willfully, falsely claimed that it was SHAYLA who intentionally coughed on restaurant patrons when, in fact, the precise opposite was true—SHAYLA was intentionally coughed upon by unruly patrons who should never have been allowed in the waiting area—or in the Saltgrass Steakhouse restaurant proper—in the first

place. A police officer interviewed Mr. Willis, and under the category "Demeanor," the officer indicated "Drunk/High."

56.     PLAINTIFFS have lived in an agitated state of fear and anxiety since learning they may have been infected with COVID-19 as a result of the attack. On July 9, 2020, PLAINTIFFS took COVID-19 tests. On July 14, 2020, they each received a negative result. Thus, for a period of seventeen (17) days, PLAINTIFFS experienced emotional distress, fear, stress and anxiety associated with the attack at Saltgrass Steakhouse.

57.     On July 3, 2020, counsel for PLAINTIFFS sent a preservation letter to Saltgrass Steakhouse's general manager in which counsel advised that any and all exterior and interior video camera recordings are relevant to forthcoming litigation. See Plaintiff's July 7, 2020 Preservation Letter, attached hereto as Exhibit 2. In late July 2020, PLAINTIFFS' claim was sent by LANDRY'S, INC. to outside litigation counsel. On August 13, 2020, in correspondence with counsel for PLAINTIFFS, outside litigation counsel for LANDRY'S, INC. claimed ignorance regarding the existence of any exterior or interior video cameras at the Saltgrass Steakhouse in question.

58.     The inference reasonably drawn from these facts is that Saltgrass Steakhouse may have destroyed, damaged, lost or misplaced video recordings captured on June 27, 2020 by the interior video cameras inside Saltgrass Steakhouse, despite LANDRY'S, INC.'s awareness of the importance of video recordings and despite the express notice represented by PLAINTIFFS' counsel's July 3, 2020 preservation letter.

59.     Upon information and belief, video recordings from the interior video cameras within Saltgrass Steakhouse will not only support PLAINTIFFS' claims as to Manager Velasco's abdication of her manager duties and their claims as to the aggression of the mob attack they

endured, but it will also reflect that Saltgrass Steakhouse was in violation of Arkansas' Phase 2 protocols and requirements.

60.    Specifically, upon information and belief, PLAINTIFFS submit that video recordings from the interior video cameras within Saltgrass Steakhouse will depict that the restaurant capacity on June 27, 2020 exceeded 66% of the maximum and will also depict that Saltgrass Steakhouse was not requiring compliance with Arkansas' face covering mandate.

## COUNT I
## NEGLIGENCE—FAILURE TO USE ORDINARY CARE AND FAILURE TO PROTECT FROM FORESEEABLE HARM FROM THIRD PARTIES LANDRY'S, INC.

61.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through sixty (60) as and for Paragraph sixty-one (61) of Count I.

62.    At all relevant times, including June 27, 2020, PLAINTIFFS were revenue-generating business invitees of LANDRY'S, INC., operating as Saltgrass Steakhouse, a restaurant business, in the State of Arkansas.

63.    As such, in Arkansas, LANDRY'S, INC. owed PLAINTIFFS, and each of them, the duty to exercise ordinary care for their safety.

64.    Moreover, in Arkansas, LANDRY'S, INC. owed PLAINTIFFS, and each of them, the duty to use reasonable care and vigilance to protect guests or patrons from reasonably foreseeable injury, mistreatment or annoyance at the hands of other patrons.

65.    In Arkansas, a business proprietor, such as LANDRY'S, INC., is required to take affirmative action to maintain order when harm to patrons is reasonably foreseeable, and certainly whether the circumstances are such as to indicate that the danger of harm to patrons by other patrons should have been anticipated by one reasonably alert.

19

66.     In Arkansas, a business owner, such as LANDRY'S, INC., may be found negligent where it fails to take appropriate action to eject persons of undesirable character from the premises or knowingly permitting irresponsible, vicious or drunken persons to be in and about the premises or fails to maintain order and sobriety in the establishment.

67.     In Arkansas, a business owner, such as LANDRY'S, INC., may be held liable for foreseeable criminal acts committed against its patrons by third parties.

68.     At all relevant times, including June 27, 2020, Manager Velasco was an employee and agent of LANDRY'S, INC., acting within the scope of her employment.

69.     The intent of Manager Velasco in abdicating her role as manager and premises enforcer of the direct orders promulgated Gov. Hutchinson was simply to maximize the money revenue generated for LANDRY'S, INC. while also attempting to avoid any responsibility for the blatant violations of Arkansas' COVID-19 public safety protocol and requirements she expressly authorized.

70.     The goal of LANDRY'S, INC., as reflected in the actions of Manager Velasco, was to make as much money as possible, even if that meant jeopardizing public safety and breaking the law.  Since PLAINTIFFS had already began eating their food and, thus, were obligated to pay, Manager Velasco also hoped that by allowing and encouraging Mr. Willis' reckless approach to PLAINTIFFS as they dined, that PLAINTIFFS would feel pressured to leave Saltgrass Steakhouse, even though Manager Velasco did not expressly tell PLAINTIFFS to leave.

71.     LANDRY'S, INC. breached the aforementioned duties in the following ways:

(a) Failed to enforce Arkansas' COVID-19 protocol and requirements; and

(b) Failed to protect PLAINTIFFS from the foreseeable harm of third parties.

72.     By reason of the wrongful acts of LANDRY'S, INC., PLAINTIFFS incurred personal injuries, great pain and significant emotional distress.

WHEREFORE, PLAINTIFFS pray for judgment against LANDRY'S, INC. in an amount which will fully and fairly compensate each of them for damages suffered.

**COUNT II**
**RACIAL DISCRIMINATION UNDER 42 U.S.C. § 1981(a)**
**LANDRY'S, INC.**

73.     PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through seventy-two (72) as and for Paragraph seventy-three (73) of Count II.

74.     Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right…to make and enforce contracts…as is enjoyed by white citizens…" See 42. U.S.C. § 1981(a).  "[T]he term make and enforce contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  See 42 U.S.C. § 1981(b).  It is the contractual relationship between the parties which makes the racial discrimination actionable.

75.     To establish a prima facie case of discrimination under § 1981, a plaintiff must show: (1) membership in a protected class; (2) discriminatory intent on the part of the defendant; (3) engagement in a protected activity; and (4) interference with the activity by the defendant.

76.     To establish the third element of a prima facie case, existence of a protected activity, the plaintiff must demonstrate that she actively sought to enter into a contract with the retailer and make a tangible attempt to contract.

77.     To be engaged in a protected activity a perspective customer must show an attempt to purchase, involving a specific intent to purchase an item, and a step toward completing that purchase.

21

78.   By not allowing PLAINTIFFS to simply choose their seats while allowing white patrons to choose their seats, LANDRY'S, INC. discriminated against PLAINTIFFS by virtue of their race.

79.   By effectively forcing PLAINTIFFS to enforce Arkansas' COVID-19 Phase 2 protocols and requirements in the face of hostile, drunken guests of Saltgrass Steakhouse on the premises of the restaurant, LANDRY'S, INC. changed an essential term of the customer/restauranteur contract because of race.

80.   By reason of the wrongful acts of LANDRY'S, INC., PLAINTIFFS incurred personal injuries, great pain and significant emotional distress.

WHEREFORE, PLAINTIFFS pray for judgment against LANDRY'S, INC. in an amount which will fully and fairly compensate each of them for damages suffered.

**COUNT III**
**DEFAMATION**
**LANDRY'S, INC.**

81.   PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through eighty (80) as and for Paragraph eighty-one (81) of Count III.

82.   To prove defamation under Arkansas Law, a plaintiff must show that she was defamed by a false statement of fact which referred to and damaged her and was published by the defendant.  The defamatory statement must imply an assertion of any objective verifiable fact.

83.   The defamatory statement of fact must have been communicated to others and must have detrimentally affected the plaintiff's reputation.  Although the plaintiff must establish actual damage to his reputation, the showing of harm is slight.

84.    On June 27, 2020, Ms. Herrmann spoke with police officers with the Little Rock Police Department about the incident that had just occurred.   According to the police report chronicling the interview, Ms. Herrmann:

- Willfully said "Mr. Willis sat at the bar several seats away from Ms. Hooks and Mr. Jackson."; and

- Willfully said that "she saw Ms. Hooks cough on purpose toward some unknown females who were with Mr. Willis."

85.    Each of these statements by Ms. Herrmann were knowingly false representations. At all relevant times, including June 27, 2020, Ms. Herrmann was an employee and agent of LANDRY'S, INC., acting within the scope of her employment.

86.    By reason of the wrongful acts of LANDRY'S, INC., PLAINTIFFS incurred personal injuries, great pain and significant emotional distress.

WHEREFORE, PLAINTIFFS pray for judgment against LANDRY'S, INC. in an amount which will fully and fairly compensate each of them for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, SHAYLA HOOKS and TYRONE JACKSON, by and through their attorneys, LAUX LAW GROUP, respectfully seek judgment as follows:

A.  That the Court assume jurisdiction over this action;

B.  Declare that the acts and omissions described herein violated PLAINTIFFS' rights under the Constitution and Laws of the United States and Arkansas;

C.  Award compensatory damages against LANDRY'S, INC.;

D.  Award punitive damages against LANDRY'S, INC. under state law; and

E.  Such further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Michael J. Laux
Michael J. Laux
W. Dist. Arkansas Bar No. 6278834
One of the Attorneys for Plaintiff
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
         mikelaux@icloud.com



**STATE OF ARKANSAS**

**EXECUTIVE DEPARTMENT**

# PROCLAMATION

TO ALL TO WHOM THESE PRESENTS COME – GREETINGS:          EO 20 - 13

**EXECUTIVE ORDER TO AMEND EXECUTIVE ORDER 20-03 REGARDING THE PUBLIC HEALTH EMERGENCY CONCERNING COVID-19 FOR THE PURPOSE OF IMPOSING FURTHER RESTRICTIONS TO PREVENT THE SPREAD OF COVID-19**

WHEREAS:   An outbreak of coronavirus disease 2019 (COVID-19) has spread throughout the world resulting in a global pandemic; and

WHEREAS:   On March 11, 2020, by Executive Order 20-03, an emergency was declared in the state as a result of COVID-19, and that emergency is on-going; and

WHEREAS:   COVID-19 continues to spread throughout the United States and Arkansas; and

WHEREAS:   In response to COVID-19, significant measures have been taken by Executive Order and Directives by the Secretary of Health to limit person-to-person contact, restrict gatherings, and suspend businesses that require significant person-to-person interaction; and

WHEREAS:   On March 26, 2020, by Executive Order 20-10, amending Executive Order 20-03, I declared the entire State of Arkansas a disaster area in which ingress and egress to and from, the movement of persons within, and the occupancy of premises therein, may be controlled, pursuant to Ark. Code Ann. § 12-75-114(e)(7); and

WHEREAS:   Pursuant to Act 96 of 1913, Ark. Code Ann. §§ 20-7-101 et seq., and the rules promulgated therefore, the Secretary of Health has the authority to impose such quarantine restrictions and regulations upon commerce and travel by railway, common carriers or any other means, and upon all individuals as in his judgment may be necessary to prevent the introduction of communicable disease into the State, or from one place to another within the State; and

WHEREAS:   On March 26, 2020, in conjunction with a directive issued by the Secretary of Health, Executive Order 20-10, amending Executive Order 20-03, imposed restrictions on gatherings of ten (10) or more people to limit the spread of COVID-19; and

WHEREAS:   Executive Order 20-10 exempted certain entities from the restrictions on gathering; and

WHEREAS:   I, as Governor, in consultation with the Secretary of Health, have determined that more actions must be taken to protect the people of the State of Arkansas from COVID-19; and

WHEREAS:   All Arkansas citizens must observe proper social distancing, and the Department of Health has issued a directive on proper social distancing protocols for businesses, manufacturers, construction companies, and places of worship; and

WHEREAS:   The State of Arkansas prides itself on being a destination for out-of-state guests who travel here to enjoy all that our state has to offer; however, during this health emergency, all resources must be maintained and

**EXHIBIT 1**

preserved to the greatest extent possible for the health and safety of Arkansas citizens; and

WHEREAS: The Secretary of Health has directed that occupancy of commercial lodgings and short-term rentals shall be limited to authorized guests as set forth in the Secretary's directive; and

WHEREAS: Executive Order 20-03 established that no quarantine regulations of commerce or travel shall be instituted or operated by any place, city, town or county against another place, city, town, or county in this or in any other state except by authority of the Secretary of Health; and

WHEREAS: Reasonable city or county curfews and closures of city or county owned parks and facilities, to prevent the spread of COVID-19, shall not be interpreted as a quarantine regulation of commerce or travel, as long as, they are consistent with this order; and

NOW, THEREFORE, I, Asa Hutchinson, Governor of the State of Arkansas, acting under the authority vested in me by Ark. Code Ann. §§ 12-75-101, *et seq.*, do hereby amend Executive Order 20-03 declaring an emergency in the State of Arkansas. The entire state is impacted by COVID-19, and I am declaring the entire state an emergency disaster area. In conjunction with the Directive of the Secretary of Health, I am ordering the following, effective as of 12:01 a.m. on April 6, 2020 until further notice:

(1) The Directives of this order shall supersede the directives of Executive Order 20-10; and

(2) All public and private gatherings of any number of people occurring outside a single household or living unit are subject to the following directives and exceptions:
   a. Due to the high risk of community spread of COVID-19, gatherings of more than ten (10) people in any confined indoor or outdoor space are prohibited until further notice. Gatherings subject to this directive include, without limitation, community, civic, public, leisure, commercial, or sporting events, concerts, conferences, conventions, fundraisers, parades, fairs, and festivals; and

   b. This directive does not apply to gatherings of ten (10) or more people in unenclosed, outdoor spaces such as parks, trails, athletic fields and courts, parking lots, golf courses, and driving ranges where social distancing of at least   six (6) feet can be easily maintained; and

   c. This directive does not apply to businesses, manufacturers, construction companies, places of worship, the Arkansas General Assembly, municipal or county governing bodies, or the judiciary; however, these entities are advised to limit person-to-person contact, maintain appropriate social distancing of at least six (6) feet, and adhere to the social distancing protocols mandated by this order; and

   d. The Secretary of Health reserves the right to exercise his authority to prevent the spread of disease in this State if, in his judgment, any of the excluded entities are operating in a manner that is a risk to public health;

(3) All businesses, manufacturers, construction companies, and places of worship shall implement the following social distancing protocols:

  a. Limit the number of people who can enter into the facility at any one time to ensure that people in the facility can easily maintain a minimum six-foot distance from one another;

  b. If lines form at a facility (inside or outside), facilities shall mark off six-foot increments at a minimum, establishing where individuals should stand to maintain adequate social distancing;

  c. Provide hand sanitizer, soap and water, or effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by the public and employees, and in locations where there is high-frequency employee interaction with members of the public;

  d. Retail businesses shall provide contactless payment systems or provide for disinfecting all payment portals, pens, and styluses after each use;

  e. Regularly disinfect any high-touch surfaces;

  f. Post a sign at the entrance of the facility informing all employees, customers, and congregants that they should: avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into one's elbow; not shake hands or engage in any unnecessary physical contact;

(4) Commercial lodgings and short-term rentals, including, but not limited to, hotels, motels, and vacation rentals, shall only permit occupancy for the following authorized guests:

  a. Healthcare professionals;

  b. First responders;

  c. Law enforcement;

  d. State or Federal employees on official business;

  e. National Guard Members on active duty;

  f. Airline crew members;

  g. Patients of hospitals and their families;

  h. Journalists;

  i. Persons unable to return to their home due to COVID-19 travel restrictions;

  j. Arkansas citizens unable to return to their home due to exigent circumstances, such as fire, flood, tornado, or other disaster;

  k. Persons in need of shelter due to domestic violence or homelessness;

  l. Employees of hotels, motels, or other service providers/contractors of a hotel or motel; and

  m. Persons away from their home due to work or work-related travel;

(5) K-12 schools and extracurricular activities, including athletic events and practices, will remain closed for on-site instruction until such time as the Governor and Secretary of Education deem appropriate;

(6) State government employees will continue to conduct business through both remote work and on-site work. On-site government work will be limited to employees that are critical to the necessary function of government during a public health emergency and are required to report to work on site;

(7) Bars, Clubs, and Restaurants shall remain closed for dine-in purposes and remain open for takeaway and delivery only;

(8) Gyms (including fitness centers/clubs, fitness classes, and group fitness studios) and indoor entertainment venues, such as bowling alleys, trampoline parks, and indoor amusement centers, shall remain closed to nonessential functions;

(9) Casinos shall remain closed;

(10) Barbers, Body Art Establishments, Body Art Schools, Cosmetology Establishments and Massage Therapy Clinics/Spas, and Medical Spas shall remain closed;

(11) The directives of the Arkansas Department of Health issued on March 13, 2020, regarding long term health facilities shall remain in effect for the duration of this order;

(12) Cities and counties taking reasonable measures to prevent the spread of COVID-19 by imposing curfews and closing city or county owned parks and facilities shall not be interpreted as a quarantine regulation of commerce or travel. Curfews should not prevent citizens of any age from traveling to and from work, acquiring food or essential goods and services, walking pets, or acquiring exercise outdoors while maintaining social distance of at least six (6) feet;

(13) Executive Orders of the Governor issued pursuant Ark. Code Ann. §§ 12-75-101, *et seq.*, have the force and effect of law. Additionally, pursuant to Ark. Code Ann. § 20-7-101, violation of a directive from the Secretary of Health during this public health emergency is a misdemeanor offense, and upon conviction thereof is punishable by a fine of not less than one hundred dollars ($100) nor more than five hundred dollars ($500) or by imprisonment not exceeding one (1) month, or both. All law enforcement officers within this state shall enforce the directives of this order and those of the Secretary of Health to preserve the health and safety of all Arkansans during this emergency.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of *the State of Arkansas to be* affixed this 4th day of April, in the year of our Lord 2020.



Asa Hutchinson, Governor



MICHAEL J. LAUX, ATTORNEY*

400 W. CAPITOL AVE., SUITE 1700
LITTLE ROCK, AR 72201
TELEPHONE (501) 242-0750
FACSIMILE (501) 372-3482
MLAUX@LAUXLAWGROUP.COM

July 3, 2020

*LICENSED IN WISCONSIN AND ILLINOIS
*ADMITTED TO THE NORTHERN AND
CENTRAL FEDERAL DISTRICT COURTS OF
ILLINOIS, AND THE EASTERN AND WESTERN
FEDERAL DISTRICT COURTS OF ARKANSAS

Saltgrass Steakhouse
c/o Assistant General Manager Oscar
10 Anglers Way
Little Rock, AR 72210

> Re:   **COVID-9 Mob attack of Shayla Hooks**
>        **DOI: June 27, 2020**
>        **LOI: Saltgrass Steakhouse, Little Rock—Outlet Mall**

Dear GM Oscar:

Please forgive my informality but I failed to get your last name during our discussion of yesterday.  As you will recall, my name is Mike Laux, and I represent Shayla Hooks, who contacted my office after she was attacked by a mob for following COVID-9 guidelines and protocol in your restaurant, Saltgrass Steakhouse.  I appreciate your giving your time and I thank you for providing contact information to corporate.  I trust you will advise your general manager of our discussion when he returns from vacation.

With this correspondence, I request that your establishment preserve any and all evidence which pertains, or may conceivably pertain, to the June 27, 2020 attack suffered by Ms. Hooks in your restaurant.  **While we are particularly interested in the preservation of all video and audio footage from inside Saltgrass and the outside parking lot area**, we also request that you preserve any and all documents, credit card receipts, credit card information, papers, materials, correspondence, Electronic Storage Information ("ESI"), emails, text messages, photographs, pay stubs, work schedules, plans, rosters, etc.  We are interested in the preservation of all video and audio recordings because, among other things, we believe that this evidence will enable us to determine the identity of Ms. Hooks' attackers, who, we believe, arrived from Louisiana on a large tour bus which was parked in front of your restaurant.

A party's obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation. *See E*Trade Securities LLC' v. Deutsche Bank AG*, 230 F.R.D. 582, 588 (D. Minn. 2005)(*citing Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004); *Zubulake v. UBS Warburg LLC'*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)).  We make this request which is in addition to the records you generally

# EXHIBIT 2

Saltgrass Steakhouse
c/o General Manager Oscar
July 3, 2020
Page 2

preserve and/or intend to preserve.  We ask that you preserve this information until any potential civil litigation in this matter has been concluded.  Additionally, we ask that you preserve any other records not specifically listed here but that are relevant to matter in question.

Should you have any questions or concerns, please do not hesitate to contact me regarding same.  I can be reached at (501) 242-0750 or via email at mlaux@lauxlawgroup.com. I thank you very much for your anticipated cooperation in preserving any and all materials described above.

Sincerely,

Michael J. Laux

cc:     General Counsel, Landry's Inc. Corporate Office
        The Corporation Company, Registered Agent,. Saltgrass Arkansas, LLC
        Tilman J. Fertitta, President, Saltgrass Arkansas, Inc.